**AFFIDAVIT
of
JOSHUA B. COOPER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION**

I, Joshua B. Cooper, being first duly sworn, do depose and state as follows:

1. I am a Special Agent (S/A) with the Federal Bureau of Investigation (FBI), and I am assigned to the Jefferson City, Missouri Office. I have been an S/A with the FBI for approximately two (2) years. In the course of my career, I have participated in investigations concerning violations of Title 18, United States Code. I am currently assigned to criminal investigations involving child exploitation, child pornography and human trafficking. I have gained expertise in the conduct of such investigations through everyday work related to these types of investigations. I have personally led investigations involving juvenile sex trafficking.

2. This affidavit is made in support of search warrant applications for thirteen Facebook accounts, as described below, and more fully described in Attachment A (incorporated by reference). This affidavit will describe how the crimes committed by the subject of this investigation, MICHAEL J. COLLINS, were documented on thirteen Facebook accounts from approximately July 9, 2017, through December 10, 2017. These accounts are described below and in Attachment A:

    a. **18-3001-SW-WJE**: All information associated with Facebook user ID 100002891427347, associated with MICHAEL J. COLLINS, that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

    b. **18-3002-SW-WJE**: All information associated with Facebook user ID 100002015943310, associated with MICHAEL J. COLLINS, that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

    c. **18-3003-SW-WJE**: All information associated with Facebook user ID 100021874842517, associated with MICHAEL J. COLLINS, that is stored at premises

owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      d.    **18-3004-SW-WJE**: All information associated with Facebook user ID 100001927452214, associated with MICHAEL J. COLLINS, that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      e.    **18-3005-SW-WJE**: All information associated with Facebook user ID 10000487822310, associated with MICHAEL J. COLLINS, that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      f.    **18-3006-SW-WJE**: All information associated with Facebook user ID 100022087665978, associated with juvenile victim A.E., that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      g.    **18-3007-SW-WJE**: All information associated with Facebook user ID 1237412826, associated with juvenile victim A.E., that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      h.    **18-3008-SW-WJE**: All information associated with Facebook user ID 100013947409601, associated with CHERYL D. DOOLEY, that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      i.    **18-3014-SW-WJE**: All information associated with Facebook user ID 100020558323793, associated with juvenile victim A.E., that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      j.    **18-3015-SW-WJE**: All information associated with Facebook user ID 100015701926618, associated with juvenile victim A.E., that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      k.    **18-3016-SW-WJE**: All information associated with Facebook user ID 100016328133425, associated with juvenile victim A.E., that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

      l.    **18-3017-SW-WJE**: All information associated with Facebook user ID 100014721337128, associated with juvenile victim A.E., that is stored at premises owned,

maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

    m.    **18-3018-SW-WJE**: All information associated with Facebook user ID 100015253505616, associated with juvenile victim A.E., that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered in Menlo Park, California, see Attachment A;

3. As set forth below, the above listed locations are believed to contain items, more fully described in Attachment B (incorporated herein by reference), which constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1591(a)(1) (sex trafficking of a child), 18 U.S.C. § 2423(a) (transportation of a minor with the intent to engage in criminal sexual activity) and 18 U.S.C. § 2252(a)(2) and (b)(1) (receipt and distribution of child pornography).

4. The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents, officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants, and does not set forth all of my knowledge about this matter.

5. On December 10, 2017, the Callaway County, Missouri Sheriff's Department provided information that A.E., a 13-year-old girl from Alabama, was missing from her home. A cell phone ping placed A.E. at 5603 Hawk Lake Dr., Fulton, Callaway County, Missouri, where A.E. was subsequently located by Fulton Police Department personnel and removed from this residence. A.E. was subsequently interviewed by Rainbow House and the FBI, and provided a statement detailing her transportation from Alabama to Missouri, which was facilitated by COLLINS. COLLINS lived at the Community Supervision Center (CSC) while on probation from a sentence for engaging in sexual conduct with a 14-year-old girl.

6. In an interview with his probation officer on December 12, 2017, COLLINS admitted to receiving oral sex from A.E. while being transported by his grandmother and mother from the CSC to his place of employment.

7. COLLINS admitted to paying his grandmother, ELAINE M. COLLINS, $400 to go to Alabama to pick up A.E. COLLINS' mother, CHERYL M. DOOLEY, was with ELAINE COLLINS when A.E. was picked up in Alabama and transported to Missouri. ELAINE COLLINS stated she agreed to pick up A.E. as a Christmas present to COLLINS.

8. A.E. stated she met COLLINS in July 2017 on an online dating site, and then began communicating with him via Facebook messenger. According to the terms of his probation, COLLINS was not supposed to be online, but he accessed the internet using his cellular telephone as well as DOOLEY's cellular telephone. COLLINS and A.E. communicated using Facebook, text messaging, WhatsApp, and Snapchat. They also spoke on the telephone. DOOLEY and A.E. also communicated regularly using Facebook messenger.

9. A.E. used her own telephone number and Facebook page as well as her mother's telephone to communicate with COLLINS on his own Facebook page and on the Facebook page of COLLINS' mother, CHERYL DOOLEY. According to DOOLEY, A.E. communicated on Facebook using at least three different accounts, and identified six separate Facebook accounts for A.E. According to COLLINS, he had had multiple Facebook accounts.

10. COLLINS and A.E. eventually started chatting online. When they first started talking online, the subject of A.E.'s age was discussed. According to COLLINS, A.E. told COLLINS she was 14 or 15. According to A.E., she told COLLINS multiple times that she was 13 years old. COLLINS did not want to believe A.E. about her age so he said she was 18.

11. When COLLINS and A.E. first started chatting online, they talked about having sex, had telephone sex and engaged in sexual role-playing that is commonly known as "sexting." Using his cellular telephone, COLLINS sent A.E. a photograph of his penis and received naked photographs of A.E. COLLINS and A.E. also talked and participated in video chatting on WhatsApp. COLLINS reported both were naked on a video chat on at last one occasion.

12. A forensic examination of COLLINS' cellular telephone (573-268-8245) showed contact "(baby) Amber" as using telephone number 256-239-1283, and "mom" using telephone number 573-268-6787. A forensic examination of A.E.'s cellular telephone (256-239-1283) showed contact "baby" as using telephone number (573-268-8245), and "mom" using telephone number 573-268-6787. DOOLEY stated that her telephone number is 573-268-6787.

13. On December 10, 2017 at 9:18 a.m., A.E. used her cellular telephone, 256-239-1283, to reset her Facebook password. Facebook was installed on A.E.'s cellular telephone on July 16, 2017; Facebook messenger was installed on July 9, 2017; and Messenger lite was installed on November 24, 2017. Also on A.E.'s cellular telephone there is a screenshot of a chat wherein a friend request via Facebook is discussed. Through review of the forensic examination of both COLLINS' and A.E.'s cellular telephones, and the admissions of the parties interviewed, it is known that COLLINS used both his own telephone (573-268-8245) and DOOLEY's telephone (573-268-6787) to contact A.E. directly and using Facebook. It is also known that DOOLEY communicated with A.E. using Facebook, and that A.E. used DOOLEY's telephone to communicate with COLLINS. It is also known that COLLINS and A.E. exchanged messages, photographs and videos using Facebook.

14. Preservation letters for COLLINS' Facebook accounts, Facebook user IDs 100002891427347, 100002015943310, 100021874842517 and 100001927452214, were sent to

5

Facebook on January 10, 2018, and a preservation letter for Facebook user ID 100004878228310 was sent to Facebook on January 17, 2018. Preservation letters for A.E.'s Facebook accounts, Facebook user IDs 100022087665978, 1237412826, 100020558323793, 100015701926618, 100016328133425, 100014721337128 and 100015253505616, were sent to Facebook on February 1, 2018. A preservation letter for DOOLEY's Facebook account, Facebook user ID 100013947409601, was sent to Facebook on February 1, 2018.

## **INFORMATION AVAILABLE FROM FACEBOOK**

15. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

17. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "friends" for purposes of Facebook, and can exchange communications or view information about each other. Each Facebook user's account

6

includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events and birthdays.

18. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

19. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the

photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

21. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles: such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

24. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the

8

account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal and Blogger.

27. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

28. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

29. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

30. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

9

rejected "friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

31.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

32.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

33.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution"

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

34. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

35. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, Government authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

36. For the reasons set forth above, I submit that this affidavit supports probable cause for a warrant to search the accounts fully described in Attachment A, and seize the items described in Attachment B.

37. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

38. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

39. The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

Further, Affiant sayeth not.

_____
**Joshua B. Cooper**
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me on this, the **5** th day of February, 2018.

_____
**Willie J. Epps**
United States Magistrate Judge

13